Milton McCRAY

v.

Robert BURRELL.

Milton McCRAY

v.

Sergeant V. D. SMITH [1]
(Badge No. 153).

Civ. A. Nos. 72–68–N, 72–234–N.

United States District Court,
D. Maryland.

Oct. 16, 1973.

---

1. Defendant's correct name is Bernard D. Smith.

------♦------

Charles F. Morgan, Legal Aid Bureau, Inc., Baltimore, Md., for plaintiff.

Francis B. Burch, Atty. Gen. of Md., and John P. Stafford, Jr., Gilbert Rosenthal and Donald R. Stutman, Asst. Attys. Gen., for defendants.

NORTHROP, Chief Judge.

## I.

### MOTION TO DISMISS

The plaintiff in these cases is an inmate of the Maryland Penitentiary. He has filed these cases alleging various deprivations and improprieties in the actions taken against him by the defendants, which he seeks to have this Court adjudicate under 42 U.S.C. § 1983. The captioned cases were consolidated for trial with two other suits, Milton McCray v. John O. Rutherford, Civ.No. 70–1409–N, and Milton McCray v. Warden, Maryland Penitentiary, Civ.No. 72–69–N. The former case was decided in a separate opinion, and the latter was voluntarily dismissed by the plaintiff before the commencement of trial.

In a joint motion the defendants have moved to dismiss the complaint on the grounds that Chapter 210, Laws of Maryland, 1971, established an Inmate Grievance Commission, whose duties are to investigate and correct grievances asserted by individuals incarcerated in penal institutions in the State of Maryland. The defendants contend that this unique procedure, which permits a full hearing and subsequent judicial review, requires the plaintiff to exhaust these available state administrative remedies.

The problems of scheduling necessitated that the Court hear arguments on the motion immediately prior to the commencement of trial. Such problems are inherent to any prisoner action against a penal institution because of the securi-

ty risks which arise in transporting a prisoner to the Court.

In Chapter 210 of the Laws of Maryland, 1971, the General Assembly took a giant step toward putting its houses of correction in order. Chapter 210 establishes an Inmate Grievance Commission as an arm of the Department of Public Safety and Correctional Services. Although the detailed workings of the Commission and its procedures will be explored at great length *infra*, the purpose of the establishment of the Commission is to afford Maryland prisoners an administrative forum which, after hearing the merits of prisoner complaints and grievances, is empowered to work within the bureaucracy of the correctional system to remedy affronts to the rights which prisoners are constitutionally entitled to enjoy during the period of their confinement. The creation and implementation of this Commission constitutes the creation of a state administrative remedy to the jurisdiction of which this Court should defer consideration of prisoner petitions brought in this Court under the provisions of 42 U.S.C. § 1983 and its companion statutes. The pertinent authority interpreting § 1983, when itself interpreted in light of a practical and reasonable judicial approach, does not prevent such a conclusion.

No one intimate with the workings of the United States District Court for the District of Maryland need be reminded of the toll which the meteoric rise in the number of prisoner petitions filed in recent years has taken upon the already heavily taxed resources of this Court. Both the Clerk's Office and the chambers of the Judges of this Court are laboring under the weight of a mound of prisoner petitions the volume of which never seems to decrease, no matter how rapidly the pending cases are adjudicated.

A look at the Annual Report of the Director of the Administrative Office of the United States Courts for the fiscal year ending June 30, 1972 and the Semi-annual Report of the Director for

the first half of fiscal 1973, lend statistical evidence to our conviction that there is little hope of relief from the swelling ranks of petitioning prisoners. At the appellate level, nearly 31% of the prisoner appeals filed nationwide were filed in the United States Court of Appeals for the Fourth Circuit in fiscal 1972. This percentage rose to 36.1% during the first half of 1973. More importantly, prisoner cases accounted for 38% of all cases filed with the Fourth Circuit in 1972, and for 45.3% for the first part of 1973.

Of greater moment for our purposes is the number of civil rights petitions filed by prisoners in the United States District Courts. In fiscal 1972, 252 civil rights petitions were filed by federal prisoners (an increase of 1,580% over 1961, and an increase of 17.8% over 1971), and 3,348 were filed by state prisoners (an increase of 1,435.8% over 1961, and an increase of 14.9% over 1971). During the first half of fiscal 1973, 155 civil rights actions were instituted by federal prisoners, and 1,891 were filed by state prisoners.

Although it cannot be denied that direct federal judicial intervention has, in recent years, served to remedy the worst examples of retrogressive American penology (as in the infamous Tucker Farm of Arkansas, see Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968)), the time has come to take a careful and critical look at the continued validity of the sweeping interpretation which has caused § 1983 to be read as a mandate to federal courts and forces them to accept all but the most patently ridiculous complaints from state prisoners, no matter how hard or how successfully the state has tried to set its own prison house in order.

An example of how the breadth of the interpretation of § 1983 has led to excessive federal judicial concern over state prisoners is presented by the litigation filed by the plaintiff in this case, Milton McCray. Since January, 1970, Mr. McCray has filed thirty-six suits with this Court, and, as Appendix A indicates, the number of prisoner petitions he files are increasing with the passage of time. The plaintiff's desire to litigate even the most outrageous complaint is illustrated by Milton McCray v. Warden, Maryland Penitentiary, Civil No. 72–69–N. In this case, which the plaintiff voluntarily dismissed at the commencement of this trial, he alleged that Officer Burrell, and other officers of the penitentiary unknown to the plaintiff, entered the plaintiff's cell on December 16, 1971, and broke open his locker. They then took from the locker twenty-three (23) pornographic books, two hundred and seventy-five dollars ($275), and ninety-five (95) packs of cigarettes, and a substantial number of other personal items.

In his complaint, which is attached to this opinion as Appendix B, plaintiff stated that he and Officer Burrell were engaged in what could best be described as a "Rent-a-Dirty-Book" enterprise. Apparently McCray was receiving between fifteen and twenty dollars a week renting these books to the other inmates. He would rent the "literature" to an inmate for two to five packs of cigarettes a night. He would then sell the cigarettes to other inmates at the discount price of four packs for a dollar.

This operation falls into the classification of the enterprises alluded to by Russell Kirk in his column which appeared in The Sun on Wednesday, June 27, 1973. In that article entitled "Jailhouse Lawyers: Latest Racket Behind Bars," Mr. Kirk discussed the revelations of a new book by Fred T. Wilkinson and Fred DeArmond, "The Realities of Crime and Punishment: A Prison Administrator's Testament." It was pointed out that prison racketeers " . . . use power to mistreat their fellows or to extort money from them." Obviously, this is what McCray was doing in this instance.

While this complaint was eventually dismissed, it was not until a substantial amount of time had been expended by his attorneys, the Maryland Attorney General's Office and this Court. After this case had been consolidated with

three other suits filed by the plaintiff, Michael Millemann, then counsel for the plaintiff, and the Assistant Attorney General representing the Warden, filed a Stipulation For Dismissal of this action, dated June 20, 1972. However, in a letter received by the Court from the plaintiff he asserted his desire that this action not be dismissed. As a result the case remained open, and preparations for trial continued. At the trial the plaintiff, through his counsel, Charles F. Morgan, requested that the Court grant him leave to dismiss this suit without prejudice. He stated that he had decided to pursue his available administrative remedy through the Maryland Inmate Grievance Commission, but if he was dissatisfied with the final disposition of the case, that he intended to refile the complaint in this Court.

A potential abuse of the right to bring action in federal court under § 1983 has thus been realized, with two adverse results. First, the caseload of all the judges has increased tremendously, causing a rising backlog of cases. Secondly, and more importantly, the length of time that elapses from the date a prisoner files a meritorious claim asserting an infringement of his constitutionally protected rights to the date of disposition, has become so great that often neither equitable nor legal relief are effective in protecting his rights. This latter consequence is due in part to the ever-increasing caseload of the courts, and to some extent is a normal reaction to prisoners who have "cried wolf" many times too often. These factors cause the great concern, and a brief analysis of the magnitude of the problem is warranted.

Recently, this Court held an evidentiary hearing in Mitchell v. Boslow, Civil No. 70–675–N (D.C.Md.1973), which involved a claim that Patuxent Institution violated the plaintiff's constitutional rights when it failed to protect him from an assault by another inmate. In order to insure that Mr. Mitchell was able to adequately present his case, it was necessary for this Court to request that a local attorney donate his time and represent the plaintiff. After plaintiff's counsel had prepared the case it was necessary to hold a conference with him, the Assistant Attorneys General handling the case for the State of Maryland, and the United States Marshal, to set up security precautions for the hearing. This was necessitated by the desire of the plaintiff to call as witnesses at the hearing seven inmates in the Maryland Correctional System who were incarcerated in three different institutions.

The *Mitchell* hearing lasted three days, March 12—March 14, 1973, with the Court finding that the plaintiff's claim was lacking in merit. During the course of the hearing it was shown that three of the five inmates who actually testified were not even confined with the plaintiff at the time of the assault. In addition, the Court noted that the attitude of one of the witnesses was: " . . . belligerent, his demeanor disrespectful. His recitation amounted to a verbal attack upon the Institution as a whole." Mitchell v. Boslow, Civil Action No. 70–675 (D.C.Md., filed March 30, 1973).

It is clear from these events that when the federal courts act as the initial forum for any prisoner who alleges a deprivation of his constitutional rights, an allegation often totally without merit, a tremendous amount of court time is required to dispose of the action. If the length of time required for each evidentiary hearing is presumed to be the same as in the *Mitchell* case, and many could quite possibly be much longer when plaintiff is not represented by counsel, it would require forty-two days of trial to dispose of the fourteen § 1983 suits that Milton McCray instituted in this Court in the calendar year 1972. If one does not take into account the time required for pretrial motions and conferences, and the time needed to write and issue an opinion, this one prisoner has occupied a judge's time for 20–25% of the fiscal year. One must be cognizant of the fact that a prisoner civil

rights action rarely is disposed of by settlement or voluntary dismissal.

In addition, since the court cannot travel to the prison itself to conduct the trials, added expense is incurred transporting the plaintiff, his witnesses and the prison personnel to the courthouse. Once this financial hurdle has been cleared, security dangers created by a large number of prisoners confined in the courthouse at one time must be confronted.

This Court is not implying that all prisoner civil rights suits are without merit, or that penal institutions in this, or any other, state are without sin. But it is suggesting that these suits will continue to consume more and more of the federal courts' time, with the result that it will take longer and longer to provide relief for those prisoners who are actually being deprived of their rights. Thus, it is imperative that the scope of § 1983 be examined, and that the viability of alternative state remedies be evaluated to determine if they can provide a speedier redress of prisoner grievances while providing them the protection of due process of the laws.

The statute which is the cornerstone of virtually all prisoner petitions filed in the District Courts was enacted as § 1 of the Civil Rights Act of 1871, 17 Stat. 13. It is now codified as § 1983 of Title 42 of the United States Code and provides:

> Every person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

For a considerable time after its passage, this statute received the narrowest of constructions. *See, e. g.,* Hemsley v. Myers, 45 F. 283 (C.C.D.Kan.1891). However, with the growing march of incorporation of Bill of Rights guarantees into the fourteenth amendment and the concomitant growth in litigative vindication of civil rights, especially where state-created or state-sanctioned racial discrimination was at issue, it was inevitable that the language of § 1983 would eventually receive a broad interpretation. Thus, in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Court opened the door to a flood of civil rights litigation by holding that, in essence, § 1983 extended to a plaintiff deprived of his constitutional rights by anyone acting, albeit unlawfully, under color of state law, a federal right to relief fully supplementary to any right of relief available for the same unlawful deprivation in state courts. Said Mr. Justice Douglas for the majority:

> It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked. [*Id.* at 183, 81 S.Ct. at 482].

Perhaps the fact that the plaintiff in *Monroe* set forth allegations of the most outrageous police conduct imaginable upon him and his family solely because of his membership in the Negro race, spurred the Court on to its statement that § 1983 was intended to afford a remedy fully supplementary to any existing (and presumably adequate) remedy of which plaintiff could avail himself in state court. It is pointed out in an extremely well-reasoned Note entitled "Limiting the Section 1983 Action in the Wake of Monroe v. Pape" at 82 Harv.L. Rev. 1486 (1969) that the fact situation in *Monroe*, outrageous to the civilized man as it may be, fell within none of the three "main aims" of § 1983 articulated by Mr. Justice Douglas, these being: (1) overriding certain kinds of state laws; (2) providing a remedy *when state law is inadequate;* and (3) providing a remedy when the state law is

adequate in theory *but not in practice.* *Id.* at 1489.

In the wake of *Monroe* there followed two cases involving racial discrimination. In McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), the Court determined that a federal action could be maintained under § 1983 despite the plaintiffs' failure to pursue available state remedy that provided both court and administrative action. The refusal to require the plaintiffs to exhaust the state court remedy was merely a reassertion of *Monroe,* but the administrative aspect of the state remedy was not required because of its inadequacy under the circumstances. Significantly, the Court pointed out that the pertinent administrative official "has no power to order corrective action." *Id.* at 675, 83 S.Ct. at 1437. The only method of enforcement at his disposal was through the state courts. Four years later, in Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967), in a brief per curiam opinion, the Court refused to deny the plaintiffs their right to bring action in federal court because they failed to exhaust a state administrative remedy. In basing its opinion on both *Monroe* and *McNeese,* the Court said of the latter, "we held that 'relief under the Civil Rights Act may not be defeated because relief was not first sought under state law which provided [an administrative] remedy,' *id.,* 373 U.S. at 671, 83 S.Ct. at 1435." (brackets original). The page reference cited a portion of the decision in which the Court rejected the requirement of exhausting state court remedies. As Judge Newman pointed out in Kochie v. Norton, 343 F.Supp. 956 (D.Conn.1972):

> Even if the interpolation of the word "administrative" was warranted, it could at most refer to the type of administrative remedy rejected in the latter portion of the *McNeese* opinion —namely, a remedy which is either beyond the power of the administrator or which cannot provide adequate protection to the right allegedly impaired. [*Id.* at 959].

The Court then took the word "administrative" out of the brackets in Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968). In a brief and unenlightening *per curiam* opinion the Court held that exhaustion of only administrative remedies would not be required of a § 1983 prisoner-plaintiff where the state Attorney General, the officer to whom ultimate administrative appeal was to be taken, had already indicated his prejudgment of the case, thereby making resort to the administrative remedy an exercise in futility. But the *per curiam* opinion then added that, in any event under the authority of Monroe v. Pape, resort to these remedies is unnecessary. *Id.* at 640, 88 S.Ct. 2119. Then in Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971), the Court stated:

> . . . State prisoners are not held to any stricter standard of exhaustion than other civil rights plaintiffs. Houghton v. Shafer, [cite omitted]. There an inmate's challenge to the confiscation of his legal materials without first seeking administrative redress was sustained. Although the probable futility of such administrative appeals was noted, we held that in "any event, resort to these remedies is unnecessary." [citations omitted]. *Id.* at 251–252, 92 S.Ct. at 409.

This summary treatment of the difficult question of administrative exhaustion by the Court in § 1983 suits led to the writing of eight separate opinions by the United States Court of Appeals for the Second Circuit in Rodriguez v. McGinnis, 456 F.2d 79 (2d Cir. 1972). This case involved a prisoner suit under § 1983 against the prison officials for loss of good behavior time credit.

Under the laws of New York a prisoner serving an indeterminate sentence may elect to participate in a conditional release program by which he can earn up to 10 days per month good behavior time credit toward the reduction of his

maximum sentence. Under the program, accrued good behavior credits can be withdrawn at any time, in whole or in part, for bad behavior or violation of institutional rules. Rodriguez had elected to participate in this program but he was charged with possession of contraband material in his cell. As a result, Rodriguez had a substantial amount of credit cancelled, and in addition, he was placed in segregation. He filed suit in the district court pursuant to § 1983, combined with a writ of habeas corpus. The district court ruled that § 1983 was a proper basis for this suit, and that the habeas corpus claim was merely an adjunct to insure full relief if the plaintiff prevailed in the dominant civil rights suit. On appeal the Court of Appeals reversed, stating that this was really a petition for habeas corpus, and as such, the petitioner was required to exhaust available state remedies. On rehearing *en banc* the Court affirmed the district court on the basis of Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971). Finally, the Supreme Court ruled that the suit was challenging the validity of fact or length of confinement, and that as such habeas corpus was the appropriate remedy. The Court stated that "a § 1983 action is a proper remedy for a state prisoner who is making a constitutional challenge to the conditions of his prison life, but not to the fact or length of his custody." Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827 at 1841, 36 L.Ed.2d 439 (1973). While affirming its decisions in *Wilwording* and *Houghton* the Court again failed to discuss the question of exhaustion of available administrative state remedies under § 1983. However, the Court did discuss the basis for applying the rule of exhaustion in federal habeas corpus actions. The Court, in discussing the rule as rooted in federal-state comity, said:

It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons. The relationship of state prisoners and the state officers who supervise their confinement is far more intimate than that of a State and a private citizen. For state prisoners, eating, sleeping, dressing, washing, working, and playing are all done under the watchful eye of the State, and so the possibilities for litigation under the Fourteenth Amendment are boundless. What for a private citizen would be a dispute with his landlord, with his employer, with his tailor, with his neighbor, or with his banker becomes, for the prisoner, a dispute with the State. Since these internal problems of state prisons involve issues so peculiarly within state authority and expertise, the States have an important interest in not being bypassed in the correction of those problems. Moreover, because most potential litigation involving state prisoners arises on a day-to-day basis, it is most efficiently and properly handled by the state administrative bodies and state courts, which are, for the most part, familiar with the grievances of state prisoners and in a better physical and practical position to deal with those grievances. In New York, for example, state judges sit on a regular basis at all but one of the State's correctional facilities, and thus inmates may present their grievances to a court at the place of their confinement, where the relevant records are available and where potential witnesses are located. The strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors thus also require giving the States the first opportunity to correct the errors made in the internal administration of their prisons. [411 U.S. 475, 93 S.Ct. at 1837–1838. (footnotes omitted)].

However, the Court emphasized that even when exhaustion is required, it is contingent on the adequacy and availability of the prisoner's state remedy.

There is a need to reconsider the applicability of the exhaustion rule with respect to § 1983 actions when there is an available and adequate state administrative remedy. This is evident when one reads the eight separate opinions issued by the *en banc* panel of the Second Circuit in the *Rodriguez* case which reflect a vast disagreement in interpreting the line of cases from *Monroe* to *Wilwording*. In addition to resolving a conflict in interpretation, a reconsideration is necessary to eliminate the contradiction created by the Supreme Court in its analysis of the exhaustion rule in the context of habeas corpus in Preiser v. Rodriguez, *supra*. In that case, the Court justified the application of the exhaustion rule in habeas corpus by invoking the concept of federal-state comity, while ignoring that it should be no less a consideration in prisoner § 1983 actions. To resolve these problems one must examine the "[v]arying views as to the breadth of the *Wilwording* holding, the strength of prior precedents, the proper character of the federal balance, and the potential impact upon judicial administration."[2] It is therefore imperative that this Court consider the validity of these factors and determine under what circumstances, if any, a requirement of exhaustion under § 1983 would be permissible.

### A. Varying Views As To The Breadth Of The Wilwording Decision

In its brief *per curiam* opinion, the Court in *Wilwording* summarily treated the question of administrative exhaustion without even mentioning whether or not such a remedy was available to the plaintiff. While it would appear that *Wilwording*, in light of *Damico* and *Houghton*, suggests that resort to state administrative remedies need never be exhausted before litigating § 1983 suits in federal district court, its holding is far more limited. *See* Kochie v. Norton, 343 F.Supp. 956, 959 (D.Conn.1972).

The main holding in this case is that exhaustion is not required when the state remedy is a judicial one, or is an administrative one which cannot provide adequate protection to the right allegedly impaired. Nowhere does the Court discuss the question of requiring a civil rights plaintiff to exhaust viable state administrative remedies before litigating his claim in a federal court.

This has provoked a variety of views as to the interpretation to be given to *Wilwording*. In *Rodriguez*, the majority of the Second Circuit interpreted the decision as a mandate prohibiting the requirements of exhaustion, whether judicial or administrative. The three dissenting judges in that case viewed it as merely suggesting that no exhaustion be required, but that it did not mandate that result in a particular case. Judge Newman in Kochie v. Norton, 343 F.Supp. 956 (D.Conn.1972), contended that *Wilwording* and its predecessors held that state judicial remedies need not be exhausted, and administrative exhaustion was not a prerequisite to federal action when the remedy was inadequate under the circumstances.

This Court is of the opinion that Judge Newman's reasoning, when viewed in light of the consequences of a "no exhaustion" rule, is compelling.

### B. The Strengths Of Prior Precedents

This factor has already been discussed at great length in this opinion, and at this juncture it is only necessary to reiterate that at no time has the Supreme Court explicitly discussed the question of administrative exhaustion under § 1983.

### C. The Proper Character Of The Federal Balance

In his opinion in Bundy v. Cannon, 328 F.Supp. 165, 171 (D.Md.1971), Judge Thomsen of this bench quoted from the

---

**2.** *See*, "RECENT DEVELOPMENTS, State Inmate's Challenge To Conditions of Prison Confinement Is Cognizable Under 42 U.S.C. § 1983 And Entails No Requirement Of Exhaustion State Remedies," 72 Col.L.Rev. 1078, 1086 (1972).

case of McCloskey v. State, 337 F.2d 72, 74 (4th Cir. 1964):

> . . . In the great mass of instances, however, the necessity for effective disciplinary controls is so impelling that judicial review of them is highly impractical and wholly unwarranted. The remedy of the inmate is through administrative review, which ought to be available always. [328 F.Supp. at 171].

This belief that the federal courts should not intervene in the functioning of state prisons except in the rarest occasions is founded on the assumption that there does exist an adequate remedy through administrative review. This is clearly shown when Judge Thomsen went on to say:

> This court notes that by the Act of 1971, ch. 210, approved April 29, 1971, effective July 1, 1971, Maryland has provided what appears to be an excellent system of administrative review of inmate grievances, through an Inmate Grievance Commission, with an ultimate right of review by the State Courts. [328 F.Supp. at 171].

What appeared to be an effective administrative procedure to Judge Thomsen in 1971, has been judged to be just that. In State of Maryland v. McCray, 267 Md. 111, 144, 297 A.2d 265 (1972), the Court of Appeals of Maryland stated:

> We think that the Inmate Grievance Commission Act and the implementing rules adopted by the Commission provide "a simple and workable procedure by which every person in confinement who has, or thinks he has, a grievance or complaint can be heard *promptly, fairly,* and *fully,*" and *obtain a judicial review* with respect to his constitutional and statutory rights. [267 Md. at 144, 297 A.2d at 282. (Emphasis added)].

It should be pointed out that to require state prisoners to exhaust such an administrative remedy does not hold them to a stricter standard of exhaustion than other civil rights petitioners, as *Wilwording* seems to suggest. In McGaw v. Farrow, 472 F.2d 952 (4th Cir. 1973), the court held that members of the United States Army stationed at Fort Eustis, Virginia were required to exhaust administrative remedies provided by the military service as a prerequisite to relief in the civil courts for violation of their constitutional rights. *Citing,* United States ex rel. Taylor v. Fritz, 446 F.2d 36, 37 (8th Cir. 1971); Gonzales Salcedo v. Lauer, 430 F.2d 1282, 1283 (9th Cir. 1970); Karpinski v. Resor, 419 F.2d 531, 532 (3rd Cir. 1969); United States ex rel. Berry v. Commanding General, 411 F.2d 822, 824 (5th Cir. 1969); Sohm v. Fowler, 124 U.S.App.D.C. 382, 365 F.2d 915, 917 (1966).

In United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) v. State Farm Mutual Automobile Insurance Company et al., 350 F.Supp. 522 (N.D.Ill.1972), a civil rights action was filed by a union and black and white motorists against the insurance rating board, insurance companies and insurance advisory organizations on the ground that, in establishing zones for new automobile insurance premium rates, defendants separated the bulk of the Negro population of the city in one zone and imposed substantially higher rates in that zone. The court held that the civil rights actions could not be maintained until the plaintiffs had exhausted their available state administrative remedies, which the court found to be an effective administrative remedy. While the *U.A.A. & A.W. of America* case involved a suit filed under § 1983, *McGaw* did not. However, the need to provide a plaintiff with protection against violations of his constitutional rights is no less great when the defendant is the United States Army. Thus, if a defendant is required to exhaust administrative remedies for an alleged violation of his rights by an agency of the federal government when the only available judicial forum is the federal court system, it would seem inconsistent not to require such exhaus-

tion when the deprivation is under color of state law.

The Court also notes that plaintiffs charging employment discrimination under Title 7 and the Age Discrimination Act are required to exhaust administrative remedies provided by statute. While it can be argued that exhaustion is required in these cases because Congress specifically provided for it, the rationale supporting such a requirement under § 1983 is no less compelling. The Court notes that while exhaustion in habeas corpus actions is also provided by statute, the Supreme Court had required exhaustion prior to Congress enacting this amendment in 1948. *See* Ex parte Royall, 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886); Urquhart v. Brown, 205 U.S. 179, 27 S.Ct. 459, 51 L.Ed. 760 (1907); Ex parte Hawk, 321 U.S. 114, 64 S.Ct. 448, 88 L.Ed. 572 (1944).

### D. *The Potential Impact Upon Judicial Administration*

This Court has already noted the statistics released in the Annual Report of the Director of the Administrative Office of the United States Courts, and the deluge of litigation instituted in this Court by the plaintiff, Milton McCray. When one evaluates the astronomical rise in prisoner civil rights litigation since 1961, and views the abuse of this right of access to the courts, it becomes apparent that not only will there be a detrimental impact upon the judicial system and its administration, but the legitimate complaints of those prisoners whose constitutional rights are in fact being violated may not be litigated for years.

However, if there is available a viable administrative remedy, then the spurious claims will be weeded out, and the district courts will be called upon to hear only those cases that are clearly of constitutional dimension. In addition, the federal district courts will have the benefit of a complete record of the administrative proceedings before the Inmate Grievance Commission, and the appeals to the state courts. Finally, when an infringement of a prisoner's rights is found, but equitable relief can be more effectively enforced by the State, this Court will be able to remand the case to the State. Under this procedure a much better record will be available to the court, the constitutional issues presented by the complaint will be definitely articulated, and the Court will not be bound to act as an advocate for the plaintiff to determine what constitutional grievances he might have.

The test that is to be used to determine the propriety of requiring administrative exhaustion in a particular case was stated in Armsden v. Cataldo, 315 F.Supp. 129 (D.Mass.1970). In that case Judge Caffrey said:

> Relevant to a resolution of whether or not exhaustion is required are considerations of the adequacy of the available state remedy, of whether or not it is really a remedy in fact as distinguished from being a remedy in theory, and of the extent of the state's interest in the subject matter of the litigation. [315 F.Supp. at 131].

Thus, the test of determining the adequacy of the available administrative state remedy is three-fold. First, the court must analyze the theoretical due process adequacy of the state remedy, particularly from the standpoint of making sure the remedy does not contain the forbidden indicia of pre-judgment which renders exhaustion inappropriate. Second, the court must look at the remedy in practice, to see that it is being administered in an even-handed and fair manner. Finally, the third relevant consideration is one that all federal courts must bear in mind when they are called upon to interject themselves into matters entrusted by our form of Government to the realm of the States, and that is, of course, the extent of the State's interest in the subject matter of the federal litigation.

Our first inquiry must be answered by looking at the statute which created the Inmate Grievance Commission in order to determine whether the remedy

therein provided is adequate in theory to redress the legitimate grievances of the inmates. The Commission is made up of five members, two of whom are lawyers, two of whom are "persons of knowledge and experience in one or more of the fields under the jurisdiction of the Department of Public Safety and Correctional Services," and one of whom is a member from the public-at-large. The current members of the Commission are:

James G. Boss, Chairman—Attorney-at-law;

James V. Bennett—Attorney-at-law, and a nationally known penologist and retired Director of the Federal Bureau of Prisons;

Maceo M. Williams—A former Patuxent Institution guard and city probation officer who is now an official of Baltimore's Concentrated Employment Program, an anti-poverty program;

Edgar A. Fulton—A retired insurance man who is now an industrial relations consultant to the U. S. Bureau of Prisons, and a member of the Maryland Advisory Board for Corrections, Parole and Probation; and

Ralph S. Falconer—Retired from Maryland Department of Parole & Probation.[3]

It is evident that the Governor has made every effort to appoint to the Commission individuals with knowledge in relevant areas and who are equipped with the perspicacity to make objective judgments, free from any institutional preconceptions of the facts of a particular in-prison incident.

The mechanics of the grievance procedure are set forth in detail in the statute. 41 Md.Code Ann. § 204F (d)–(l) (Supp.1971). Suffice it to say here that the procedures assure a detached and unbiased resolution of particular cases, culminating in judicial review of the administrative adjudications.

Any person confined in a state prison, or any patient of Patuxent Institution, who "has any grievance or complaint against any officials or employees of the Division of Correction or the Patuxent Institution"[4] may submit the grievance or complaint to the Commission. The Commission is given original administrative jurisdiction unless the particular facility in which the complaining inmate is confined has an internal grievance procedure approved by the Commission, in which case the inmate must first exhaust the institutional procedure before filing with the Commission.

According to the testimony of the present Executive Director of the Commission, Dene L. Lusby, a grievance is first screened by the Executive Director. While the complaint may be dismissed if it "is determined to be on its face wholly lacking in merit," this statutory authorization is not used. Mr. Lusby testified that the Commission did not want to deny an inmate the opportunity for a hearing. However, complaints are dismissed without a hearing when the initial screening process reveals that the Commission lacks jurisdiction, as where an inmate erroneously files for habeas corpus relief with the Commission. In practice, then, the Commission's jurisdiction mirrors the traditional areas of § 1983 jurisdiction in prisoner cases.

When questioned about the initial filings with the Commission, Mr. Lusby stated that as of May 31, 1973, 923 complaints had been received, of which 98 cases (10%) remained opened to be investigated and/or heard if the same were not dismissed, withdrawn or informally resolved. Under the present Commission procedures, an inmate may request to withdraw his complaint, and he

---

3. At the time of the hearing in these cases, June 11 through June 14, 1973, Jeffrey Levitt, an attorney-at-law, was a member of the Commission. He has since resigned, and Mr. Falconer is newly-appointed to fill the vacancy.

4. Virtually all § 1983 prisoner complaints are premised upon some abuse of authority possessed under color of state law; such was the jurisdictional meaning read into § 1983 in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

will usually be allowed to do so immediately. However, in a few instances, when the nature of the complaint warrants, he is required to withdraw in front of the Commission. Mr. Lusby further stated that he attempts to informally resolve prisoner complaints by contacting the involved institution and requesting that it voluntarily abate the condition upon which the inmate based his grievance. In these instances any resolution would be favorable to the complaining inmate.

The Executive Director's testimony concerning a number of Commission statistics may be summarized as follows:

1. Complaints received from 7/1/71 to 5/31/73 ... 923
2. Administrative dismissals (complaints that are on their face without merit, complaints that are withdrawn by the inmate, complaints over which the Commission lacks jurisdiction and complaints that are informally resolved) ... 507
3. Hearings held from November, 1971 to May 31, 1973 ... 318
4. Disposition
   a. Some or all relief granted ... 103
   b. No relief granted ... 152
   c. Moot, because prisoner released or escaped ... 10
   d. Pending disposition ... 50
5. Open complaints as of May 31, 1973 ... 98
6. Scheduled for hearing ... 58
7. Not scheduled for hearing ... 40

If the complaint is not dismissed, withdrawn or informally resolved, the Commission is directed to hold a hearing on the grievance as promptly as practicable. The Commission meets twice a week, generally on Wednesdays and Fridays, to hear the grievance of any inmate confined to an institution within the Division of Correction, at the institution where the inmate is housed. At least three Commissioners must sit for each hearing, and decisions are made by a majority of those sitting. A Voicewriter record is made of all hearings, and is transcribed when the inmate seeks judicial review. This procedure was adopted on December 1, 1972. The Commission's decision is issued in the form of an order, setting forth findings

of fact, the Commission's conclusions, and the disposition of the complaint. The disposition may take either of two forms. If the complaint is found after a hearing to be "wholly lacking in merit" it may be dismissed, and such dismissal shall constitute the final order of the Commission for purposes of judicial review. On the other hand, if the complaint is found to be meritorious, in whole or in part, the Commission will so notify the Secretary of Public Safety and Correctional Services. The Secretary may then take either of two actions. He may reverse or modify the order, if he disagrees with the Commission. If he agrees with the Commission's order, as received or as modified, the Secretary shall order the appropriate official of the institution against whom the grievance was filed to accept the Commission's recommendations. Further, the Secretary is empowered by the statute to "take whatever action he deems appropriate in light of the Commission's findings." It is intended that the Secretary will use this grant of power to discipline or otherwise correct officers under his command who have been found guilty by the Commission of engaging in conduct giving rise to a legitimate complaint by the inmate affected. The Secretary's order carrying out the recommendations of the Commission shall constitute a final order for the purpose of judicial review.[5]

The Act gives the Commission the power to require by subpoena the production of any documents by the person or institution under investigation. Further, the Commission may, by subpoena, require the attendance of any person as a witness and the production by that person of any relevant documentary evidence. On cross-examination, Mr. Boss, the Chairman of the Commission, testified that no witness has ever refused to appear before the Commission and that there had never been, to the best of his knowledge, any requests for a subpoena.

5. It was asserted at the hearing that on two occasions the Secretary reversed the Commission's recommendation. These reversals were appealed, and in both cases the Commission's recommendation was reinstated.

While, the testimony of Robert Coulter, the first Executive Director of the Commission, contradicted this assertion of Mr. Boss, and in general tried to discredit the Commission, several factors mitigated the effect of his testimony. First, the period that he was serving the Commission as its Executive Director can best be described as the Commission's formative period. It was involved in implementing the directives of the enabling statute, and it is understandable that problems would exist at this time. Secondly, while his testimony conflicted frequently with that of Mr. Lusby and Mr. Boss, it is significant that neither Mr. Boss nor Mr. Lusby were associated with the Commission at the same time as Mr. Coulter. Therefore it is understandable that Coulter's experience with the Commission's procedures might be entirely different from that of the present Chairman and Executive Director.

The Act also spells out the procedural requirements of the Commission's hearings. In addition to the fact that the hearings of the Commission are to be recorded and transcribed as required, the Act makes several specific provisions to insure that the tests of procedural due process are met by the Commission's hearings. The inmate-complainant has the right to appear in person before the Commission, and, unlike a trip to court for the inmate, this appearance will not impose any special security problems insofar as the Commission is empowered to hold its hearings at any correctional facility, including the Patuxent Institution. The inmate-complainant is given the right to call witnesses in support of his position, subject to the discretion of the Commission as to the number of witnesses called and the relevance of their testimony. Only witnesses whose testimony would be merely cumulative are excluded. This determination is based on the complaining inmates' assertions as to the subject matter of their testimony. It is further provided that the inmate-complainant is to be given a reasonable opportunity to question (cross-examine) *any* witnesses who testify before the Commission. These rights of the inmate to the attendance, examination and cross-examination of witnesses "shall not be unreasonably withheld or restricted by the Commission."

The witnesses are not sworn because the Commission has decided that inmates appear to be more relaxed testifying when they are not concerned, or threatened, with the consequences of perjurious testimony. Finally, the inmate is allowed to be represented by an attorney of his own choosing at his own expense, by a law student, or by another inmate. Mr. Lusby testified that an inmate has counsel about 5–10% of the time, and that they are represented either by counsel or a law student approximately 30% of the time. Of course, there is no need for the appointment of counsel, at the expense of the State, for the purpose of representing the inmate, as the hearing is solely remedial, not disciplinary or punitive, in nature.

Upon the entry of a final order in his case, the inmate-complainant may initiate judicial review of the orders of the Commission and the Secretary in the circuit court of the county or city in which he is incarcerated. The judicial review is a review on the record and is limited to a determination of whether there was a violation of any right of the inmate protected by federal or state laws or constitutional requirements. Although Ch. 210 is silent on the point, it appears from a reading of the Maryland Rules of Procedure and the Administrative Procedure Act (see Md.Code Ann., art. 41, § 256) that an appeal can be taken from the action of the reviewing circuit court to the Court of Appeals of Maryland.

■ It appears to this Court that there is a viable alternative to direct federal judicial intervention in the State correctional process via § 1983. When the enlightened procedures prescribed as a result of Bundy v. Cannon, *supra,* for the imposition of in-prison punishment are combined with the more than ade-

quate remedial route furnished by the Inmate Grievance Procedure Act, there emerges a picture of a state correctional system which is truly cybernetic. Indeed, the state judicial system has become increasingly involved in remedying the complaints of Maryland inmates, as witness the unprecedented action of the two-judge Circuit Court which conducted an extensive inquiry into the conditions at the Patuxent Institution, McCray v. State, Misc.Pet. 4363 (Cir.Ct.Mont.Co., November 11, 1971), *reversed in part*, State v. McCray, 267 Md. 111, 297 A.2d 265 (1972). In that case the Court of Appeals of Maryland noted:

> We take judicial notice that the Commission is now fully operative. It began operation upon the appointment of an Executive Director on 30 November 1971. Rules and Regulations implementing Code, Art. 41, § 204F were adopted. Public Safety and Correctional Services, 12.07.00.00.–12.-07.00.05. The first hearing session was held on 17 December 1971 and hearings have been held continually since that time. Almost 600 complaints have been received from inmates and about 100 orders issued. The complaints and the disposition of them are open to public inspection pursuant to Code, Art. 41, § 204F(i). [267 Md. at 144 n. 27, 297 A.2d at 283].

Further evidence of the Inmate Grievance Commission's viability was reported in *The Sun* on December 8, 1972. *The Sun* reported: "An order banning the use of an extremely painful restraining device known as the 'iron claw' in Maryland prisons has been announced by the State Inmate Grievance Commission." This order was the result of a complaint filed by two prisoners at the Maryland Correctional Institution in Hagerstown that the iron claw was used on them in violation of the eighth amendment of the Constitution.

The State's interest in the subject matter of the prisoner complaints under § 1983 is paramount. The extent of this interest was clearly defined by the Supreme Court, Preiser v. Rodriguez, *su-pra*, in the passage already cited in this opinion. Thus is presented the picture of a complete, self-contained and self-executing administrative process set up by the State to resolve prisoner complaints justly and expeditiously. Clearly, the federal courts have neither the time nor resource, nor experience enough, to justify their interjecting themselves into the job of running state penal institutions.

The question of federal court interjection into this area has been the object of considerable study during the last year. One such study is the Report Of The Study Group On The Caseload Of The Supreme Court, 57 F.R.D. 573 (1972). In that Report the problem of prisoner petitions is discussed and analyzed as follows:

> (d) *A court of criminal appeals. The problem of prisoners' petitions.* The dangers of polarization and politicization would be particularly intense in an appellate court whose only concern was the review of criminal convictions. Moreover, there is an inherent dilemma in such a plan, turning on whether or not there would be further review on certiorari in the Supreme Court. If such review were provided, the screening function of the Supreme Court would not be materially relieved. If review were not provided, defendants in criminal cases would be placed in an inferior and invidious position with respect to access to the Supreme Court. We reject a proposal that would put this class of litigants in that position.

> But the problem of prisoner petitions, which the Supreme Court shares with lower federal courts and to some extent with State courts, has grown ever more pressing in the last decade or so, and does demand special attention. We refer both to collateral attacks on criminal convictions and to complaints concerning conditions in prisons.

> On the Supreme Court's docket at the October Term, 1971, the number of petitions in habeas corpus and other

collateral attack cases was 758. Total State and federal prisoner cases filed in the lower federal courts in 1971 came to 16,266.

Most of the cases are brought by State rather than federal prisoners, although filed in federal courts, and most are habeas corpus petitions. But a substantial number of prisoner cases —3,129 filed in the federal courts in 1971—are civil rights complaints concerning conditions in prisons, and these will increasingly filter up to the Supreme Court. The continuing rise in the volume of prisoners' petitions, on the docket of the Supreme Court as also on the dockets of all federal courts, is reflected in figures collected by the Solicitor General. There is close identity between these petitions and filings *in forma pauperis*. The Solicitor General reports that the number of papers filed by his office in the Supreme Court of the 1971 Term in ifp cases increased by 35.1% over the previous Term. The comparable increase in paid cases was 17.-3%. (Memorandum To The Solicitor General's Staff, July 6, 1972.)

The number of these petitions found to have merit is very small, both proportionately and absolutely. But it is of the greatest importance to society as well as to the individual that each meritorious petition be identified and dealt with. And yet it seems a misallocation of resources to impose the burden of sifting through the mass of these petitions on federal judges, let alone on Supreme Court Justices. Moreover—and this is at least as important—these overburdened judges and Justices, charged with so many other highly important functions, are less likely to give full and careful attention to each petition than officials whose special task it might be made to do so. The problem is somewhat analogous to one faced by the medical profession. Mass screening of thousands of people will uncover cancer in very few, but it will diagnose it in some at a stage where prospects of cure are good. The mass screening enterprise is, therefore, justified. But the screening is not conducted by highly trained surgeons. To use surgeons for this purpose would be to misuse them. Nor, unless they are relieved of their other, more demanding functions, will surgeons likely perform this routine task with the care it routinely requires, if undertaking it at all is to be justified.

As the Solicitor General has remarked (Memorandum To The Staff, *supra*), "[i]t seems obvious that there should be a better way to deal with these questions [presented by ifp prisoner petitions], at least with respect to collateral review." It is satisfying to believe that the most untutored and poorest prisoner can have his complaints or petitions considered by a federal judge, and ultimately by the Supreme Court of the United States. But we are, in truth, fostering an illusion. What the prisoner really has access to is the necessarily fleeting attention of a judge or law clerk. The question is, would it not be better to substitute for the edifying symbol, and the illusion that it presents, the reality of actual, initial consideration by a non-judicial federal institution charged exclusively with the task of investigating and assessing prisoner complaints of the denial of federal constitutional rights. This institution, headed by an official of high rank, would have a staff of lawyers and investigators, and a measure of subpoena and visitatorial powers. It would be charged to investigate complaints, make a response to them, and where possible, try to settle in-prison grievances by mediation.

All petitions for collateral review or for redress of grievances concerning prison conditions, from State or federal prisoners, which could now be filed in a federal court, would go initially to this new institution at the election of the prisoner or by referral to it at the discretion of the court in which a petition is filed. Three months might

be allowed the new service for dealing with a complaint or petition lodged originally with it. At the end of this period the prisoner could file his papers with an appropriate court, but the papers would be accompanied by a report from the new institution. Thereafter, the matter would proceed as it would now.

Obviously, the details of this proposal remain to be worked out; we believe it merits prompt further study and consideration. [57 F.R.D. at 586–588].

Another suggestion concerning the problem of prisoners' petitions appeared in an article entitled "Prison Ombudsmen Provide a Safety Valve," 56 Judicature 314, March 1973. The article discussed the institution of an ombudsmen system in the prisons to provide effective relief from maladministation. The author then went on to say:

In an era where the courts have become overburdened, emphasis should be placed on finding alternative or complementary means of achieving just results without unduly increasing the courts' caseloads. An office of ombudsman could serve this function. As primarily a complaint investigation mechanism, the office could readily eliminate duplication of effort by providing independent offices of state legislatures, the courts, and even the correctional administrators with information which would not otherwise be available to them. By improving communication and facilitating investigation, the ombudsman would be able to complement the sophisticated information systems which presently exist in government.

The true value of the ombudsman lies not as a substitute for existing complaint handling mechanisms but as an added protection which attempts to enhance the total grievance machinery by eliminating the present system's weaknesses. It would serve to stimulate present procedures within the correctional system itself, and by so doing would lessen the number of grievance complaints that are now gravitating to the courts. By reducing the number of frivolous complaints and complaints which are not well-suited for judicial determination, the courts would be provided more time to devote to adjudicating issues which are of greater importance. An avenue of redress such as this might indeed cause the courts to become more receptive to the complaints which eventually reach them. [56 Judicature at 315].

It appears to this Court that the Maryland Inmate Grievance Commission combines the best of both suggestions, that is, initial investigation by a non-judicial institution charged with the responsibility of investigating and assessing prisoner complaints, and provision for subsequent review by the courts. In addition, the federal-state balance is preserved in the manner expressed by the Supreme Court in Preiser v. Rodriguez, *supra.*

In light of these developments, the least the federal court can do is to give the State system a chance to continue to purge itself of its abuses, which can only be done if inmate complaints are channeled via the inmate grievance route. It must be emphasized that the imposition of the exhaustion requirement outlined in this opinion does not take away the right of the aggrieved inmate to resort to a federal remedy. All it does is to put the remedy one step beyond immediate reach. If the inmate does not receive justice from the State procedures, he can then file his complaint in the District Court under § 1983. As previously pointed out, this Court does not think that anything in the prior trend of decisions prohibits this action, although, in all candor, the cases would not seem to encourage it. But those were different cases dealing with different facts, with administrative remedies almost neolithic compared to the Maryland Inmate Grievance Procedure. In fact, even if *Wilwording* is interpreted broadly, the United States

Court of Appeals for the Fourth Circuit, in Hayes v. Secretary of Department of Public Safety, 455 F.2d 798 (1972), indicated:

> While Maryland has recently established an Inmate Grievance Commission . . . to determine and recommend the proper redress for meritorious grievances of inmates of Patuxent and other correctional institutions, we take judicial notice of the fact that the Commission is not yet fully operative. When it is, there will be time enough for the Supreme Court to determine if Monroe v. Pape, and we, our own decisions, should be reexamined . . . . [455 F.2d at 800].

This Court believes, as does the Court of Appeals of Maryland, that the Commission is now fully operative, and takes judicial notice of that fact. Therefore, the time for reexamination is now.

In prisoner rights cases, as in any other § 1983 cases, the federal courts are called upon to exercise both aspects of their jurisdiction, in equity and law. Insofar as the Maryland statute creating the Inmate Grievance Commission does not give the Commission, (or the reviewing courts, for that matter) the power to award money damages for the deprivation of constitutional rights which may not amount to a tort under the laws of Maryland, a serious question as to the propriety of our action might arise if we made the Maryland administrative procedure the sole and *exclusive* remedy for prisoners seeking redress for deprivation of constitutional rights, thus forever barring them from access to the federal damages remedy inherent in § 1983. However, the only thing which the imposition of this exhaustion requirement would do in these cases is to work a *postponement* of the ultimate award of damages in a meritorious § 1983 suit. Although it may be true that very few § 1983 cases ultimately result in the awarding of damages, it is equally true that a federal court cannot close its doors forever to a claim for damages in § 1983 cases, even if an otherwise wholly adequate state remedy exists.

It is clear that the enabling legislation gives the Commission, and seems to give the reviewing courts, only powers comparable to the equity powers exercised by the federal courts, in that the Commission and the Secretary can order the officers and institutions of the correctional system to stop practices offensive to constitutionally safeguarded rights. The fact that directives have been issued by the correctional system was testified to by Mr. Lusby, and the Warden of the Maryland Penitentiary, Gerald H. McClellan. The plaintiff introduced evidence that one of these directives, which requires two guards to be present when a prisoner's cell is being inspected for various reasons, has not been followed. The Warden, however, pointed out that this was due to a tremendous shortage of prison guards. Under such circumstances, it would make little difference if the directive had been issued by a federal court under the threat of contempt, or by the Secretary of the Commission.

Of the two types of relief available under § 1983, *viz.*, injunctive relief and monetary damages, the type that demands the more immediate adjudication is obviously injunctive relief. Mr. Lusby testified that the Commission had on several occasions issued orders that, in essence, granted the complaining inmate injunctive relief. In I.G.C. No. 1521, In the matter of: Joseph Wallace # 107093, Maryland Penitentiary, an interim order was issued on December 4, 1972. In this order the Commission recommended that Mr. Wallace be taken to the University of Maryland Hospital for an orthopedic examination. As a result, the inmate was taken to the hospital for examination on December 15, 1972.

In I.G.C. No. 1383, In the matter of: James Brady et al., Patuxent Institution, a grievance was filed to contest the suspension of "lawn visits" by the Institution. It had been the practice at Patuxent to permit such visits on Sundays during the warm weather months, weather permitting. During one of the visits one of the patients attempted to

escape, and because the other patients did not try to deter the escapee, the Institution suspended all lawn visits for twelve weeks. As a result of this complaint the Commission issued an interim order in the nature of an injunction staying the suspension of the "lawn visits" until an adequate hearing was held.

Mr. Lusby also stated that the Commission had assumed that it had the power to grant "class relief." While the plaintiff pointed out several grievances requesting class relief which had not been granted, it is significant that they were dismissed as being without merit. In I.G.C. Nos. 1295 and 1282, the Commission made recommendations that were approved by the Secretary for the proper administration of the protective custody tier at the Maryland Penitentiary.

It is clear that not only does the State Inmate Grievance Commission have power comparable to the United States District Courts in such cases, but it is certain that the powers of the Commission can, in most cases, be exercised considerably more quickly to remedy offensive patterns of official conduct than can the powers of the federal courts. This is due, of course, to the crowded dockets of the courts in which, of necessity, prisoner cases often receive the lowest priority. Also, the fact that the Commission functions in close conjunction with the Secretary of Public Safety and Correctional Services gives its orders a degree of practical enforceability which those of the court often lack, insofar as judicial decrees are dependent for their enforceability upon respect for the judicial process and fear of incarceration for contempt. Obviously, very few state officers are ever imprisoned for contempt of a federal court order, and one may wonder how willingly they comply with the terms of such an order. However, where, as here, the authority enforcing an order to cease-and-desist from a certain practice is the authority with the power to fire or otherwise discipline an officer who balks at compliance, it would seem that corrective orders would be more enforceable as a practical matter than may be similar orders of a federal court. An added factor weighing in favor of the superiority of the state administrative procedure in the area of equity-type relief, is the fact that the Commission, through the Secretary, has power to discipline, or even fire, persons who are guilty of abusing prisoners. Obviously, no federal court has like power for not even the most fervent federalist would support the notion that a federal court can take administrative sanctions against particular state officers.

Thus, it is clear that the Maryland Inmate Grievance Procedure offers not only an effective, but a swift, alternative to the exercise of federal equity power under § 1983. Of course, upon exhaustion of the state remedy, an inmate, in a proper case, may still call upon the equity power of the federal court if the exercise thereof is needed in a particular case. If, of course, the remedy of damages is needed to make a prisoner whole again in a particular case, that remedy will likewise be available to the prisoner after he has exhausted the state administrative procedure, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) v. State Farm Insurance Company, 350 F.Supp. 522 (N.D.Ill. 1972). Unlike the situation with respect to injunctive or other equity-type relief, there is no sense of immediacy attendant upon the awarding of money damages to redress particular deprivations of constitutional rights. The money damages are only given in such cases where the rights infringed upon are admittedly incapable of any sort of rational valuation, because it often seems the only way to compensate a person for the wrong that he has suffered. Indeed, our whole common law scheme of awarding damages in civil cases turns upon the assumption that the money paid by the malefactor to the injured party is the cure-all for legal wrongs. We are not so sure that this is the case in the prisoner rights area, insofar as the equity-type relief which the Maryland Commission

can give, as outlined above, seems not only more readily available, but also more meaningful. At any rate, it is clear that whatever postponement of the right to money damages under § 1983 is worked because of the imposition of an exhaustion requirement does not amount to a deprivation of the ultimate right to such relief in theory, nor is it a deprivation in practical effect. This is true because an award of money does not require the immediate attention which ought to be given to demands for equitable relief, which in fact is given under Maryland procedure. The key point is that the ultimate right to damages is preserved during the complainant's pursuit of his state administrative remedies, and is not destroyed by a requirement that he resort to these remedies before bringing his federal action under § 1983.

█ Therefore, this Court concludes that before it will exercise jurisdiction over a prisoner § 1983 complaint, the inmate must exhaust the available state administrative remedy provided by the Maryland Inmate Grievance Commission procedure. Even if the complaint seeks only monetary damages, this avenue of relief should be exhausted. The claim for monetary damages is inextricably tied to prison regulations and disciplinary procedures. The Maryland Inmate Grievance Commission provides a forum with built-in judicial review which can more expertly sort out the meritorious from the frivolous.

Such a disposition by initial action in the federal courts is not attainable except by tortuous process, as demonstrated by these cases as well as the vast majority of other § 1983 prisoner petitions. Nor does it frustrate the original intendment of § 1983, for having taken this route the complaining prisoner can come to this Court with the issue of liability clearly defined on the record. Thus, the federal court can readily dispose of the litigation in the same manner in which it now handles habeas corpus petitions.

These two McCray cases, in accordance with the foregoing opinion, should be dismissed. But to further highlight the tedious process in which a federal court must engage, these cases will be disposed of on the merits as well.

## II.

### MERITS

█ The complaints in both of these actions invoke jurisdiction of the Court pursuant to 28 U.S.C. § 1343(3) and (4), 42 U.S.C. § 1983, and the Constitution of the United States of America. Plaintiff alleges in both cases that the acts of the defendants unconstitutionally deprived him of his right to be free from physical abuse and cruel and unusual punishment as guaranteed by the eighth and fourteenth amendments to the Constitution. He further contends that in both cases this abuse and punishment was arbitrarily imposed in violation of the due process clause of the fourteenth amendment. He also charges that Captain Burrell acted to deny him proper medical care following injuries allegedly received in a fire in his cell.

The testimony in both of these cases, as in most prisoner complaints of this type, is in conflict. While a general picture of the circumstances did develop, the question of liability hinges on the credibility of the witnesses. The Court as the trier of the facts must consider not only the evidence introduced, but also must evaluate the demeanor of the witnesses to determine their credibility. The contradictory statements of the plaintiff during the trial of these cases considerably diminished his credibility. One obviously blatant false assertion occurred after he had informed the Court that he had lost count of how many cases he had pending before the various judicial forums in the State. In response to a question posed by the Court, Mr. McCray stated that he never files complaints in more than one court based on the same cause of action. After the conclusion of the trial, it came to the Court's attention that the plaintiff had

filed a suit in the Superior Court of Baltimore City alleging the same constitutional deprivations as are involved in Civil No. 72–68–N (Milton McCray v. Captain Burrell). While the defendant in 72–68–N is Captain Burrell, and the suit filed in the Superior Court is against the Warden of the Maryland Penitentiary, 72–68–N was amended at the time of trial by the plaintiff eliminating the Warden and the Penitentiary Medical Staff as defendants. Clearly this indicates, contrary to the plaintiff's contention at trial, that he does attempt to litigate the same causes of action simultaneously before more than one forum. A copy of the original complaint filed in 72–68–N, and a copy of the complaint filed in the Superior Court are included as appendices to this opinion.

The factual situations in both cases center on disruptive incidents involving the plaintiff, and a determination by the defendants that he be placed in an isolated cell without clothes or a mattress. In Milton McCray v. Sgt. V. D. Smith, (Sgt. Bernard D. Smith) Civil No. 72–234–N, the plaintiff alleged that on November 20, 1971, while he was confined on the Maryland Penitentiary's South Wing (a wing used to house inmates who have violated prison regulations), Sgt. Smith removed him from his cell, and placed him in the isolated confinement area (I.C., known to the inmates as the "hole") for approximately two days.

The plaintiff was on the South Wing between November 17 and November 20, 1971. Prior to November 20th, Sgt. Smith had never met McCray. Plaintiff admitted that on November 20, 1971 he was placed in a cell on the "street side" of the South Wing, but that he asked to be moved to another cell when he discovered that the cell was in an unsanitary condition (he alleged that there were lice in the cell). Sgt. Smith then came to McCray's cell and took him to the "flats" (the lowest tier on the South Wing). Plaintiff was then given a shower and was deloused, and Sgt. Smith was told by the Warden of the Penitentiary to provide the plaintiff with his law books and legal materials while he was on the South Wing. However, these orders were not complied with because, according to the unrefuted testimony of the defendant, the process of packing and moving personal belongings could take from two to three days to complete. The Court notes at this juncture that there was testimony during the course of these trials that the Penitentiary has been forced to operate with a substantial shortage of prison personnel.

After the plaintiff had been placed in a cell on the fourth tier, "yard-side," of the South Wing, he began "hollering and yelling," demanding his legal materials and his medicated shower. Apparently this disturbance, which was quite substantial according to testimony of both the plaintiff and the defendant, prompted Sgt. Smith to remove McCray from the South Wing and place him in the isolated cell area. Clearly this measure was taken to avoid the possibility of causing a greater disturbance among the other inmates.

While the defendant was transferring the plaintiff from his cell on the South Wing to the I.C. area, McCray began shouting insults and threatening to do bodily harm to himself. Interpreting these threats as an indication of mental and emotional instability, and having personal knowledge of prior incidents involving inmates in isolation who had committed suicide, Sgt. Smith decided to strip McCray and remove the mattress from the cell. He testified that he felt it was better to subject the plaintiff to some discomfort than to risk that he might attempt to kill himself.

The cell in which McCray was placed, I.C. #5, was about 4–5 feet wide, 12–16 feet long and 12 feet high. It had four concrete walls, a concrete ceiling and a concrete floor. At the front of the cell was a solid, metal door and a barred, grill-type door, either or both of which could be closed. There was a toilet and a sink in the cell, and on the floor was a concrete slab about 9 feet long, 3 feet

wide and 12 inches high. Normally a mattress is placed on this slab and serves as the inmate's bed.

It was shown during the trial that the recommended procedure, when a prison official places an inmate in the I.C. area, requires that he notify his immediate superior. It is significant that no evidence, other than the absence of any reference to McCray in the log book during this period, was introduced to indicate that the defendant had not complied with this directive. Sgt. Smith testified that they try to log all occurrences, but if there is considerable activity among the inmates, often the guards are unable to make these entries.

The next day when Sgt. Smith checked the plaintiff he discovered that McCray had defecated in a cup, and smeared this waste throughout the cell. Smith then notified the psychologist, Mr. Musk, and decided to retain McCray for an additional day. While it appears that Mr. Musk may not have examined the plaintiff before he was removed from the I.C. area, it is possible that this may have been due to the fact that November 21st was a Sunday. Mr. Musk testified that he did not recall talking to McCray about this specific incident, nor did he have a record of such a meeting. However, it was brought out during his testimony that he had spoken to the plaintiff on at least ten occasions, and he had made a record of only four of these visits.

Plaintiff also alleged that he was not given any showers during the two days that he was confined in I.C., but the records introduced at the trial clearly indicated that he was given a shower on November 20, 1971.

The incident that is the basis for McCray's suit against Captain Burrell occurred on January 1, 1972. The plaintiff had been placed in Cell #325 on the South Wing on December 31, 1971 sometime between 6:00 and 7:00 p.m. The defendant was a correctional officer and a duty captain whose responsibility was the operation and administration of the entire Penitentiary on the 8 a.m. to 4 p.m. shift.

Plaintiff had been placed in cell #325 by Officer Fazzio, and it appears that the cell had not been cleaned since the departure of the last occupant. There was paper, dirty blankets, a metal locker and other trash lying on the floor. The plaintiff requested that the cell be cleaned up, but was informed that it was too late in the evening. McCray then swept the trash in front of his cell door to be pushed out into the tier the following day.

At approximately 9 a.m. on January 1st he borrowed a cigarette and a light from the inmate in the adjacent cell, even though he testified that he usually does not smoke. The plaintiff alleged that he dozed off with the lit cigarette in his hand, and when he awoke the cell was filled with smoke. He testified that he did not set the fire intentionally, but he was charged with purposely causing the fire. Plaintiff stated that he jumped from bed and attempted to stamp out the fire, and when this failed he tried to smother the blaze with the mattress, but this merely worsened the situation.

He then took a bucket that was in the cell and tried to carry water from the sink to douse the fire. The bucket, however, would not properly fit under the sink to allow plaintiff to fill it sufficiently for it to be useful. He then used the metal cabinet which was lying on the floor of the cell to first break the sink and then the toilet in alleged efforts to allow the water to flow more freely. When these attempts failed he covered his head and body with water.

The guards, in the meantime, had attempted to put out the fire but the fire extinguisher did not work properly. After a short period of time, they procured a second extinguisher and managed to put out the fire.

The plaintiff testified that he had suffered burns to his hands and face, but the testimony of the nurse on duty at the time of the fire, Mrs. Weber, and

the dispensary records, revealed that there were no blisters or serious burns evident. She stated that when the plaintiff was brought into the infirmary he was arrogant and initially refused to allow Officer Martin to apply cold compresses to the areas that he complained had been burned. However, the officer was finally able to apply the compresses and bacitracin ointment to his burns. His eyes were irrigated and his ears were washed out. Mrs. Weber, according to the testimony of the plaintiff, then recommended that he be placed in a locked cell. Captain Burrell ordered that he be placed in the Mental Observation area (M.O.). Captain Burrell testified that he issued this order because he had been informed that the plaintiff had intentionally set the fire, and, since this was not a rational act, he believed that the inmate was mentally unstable. Captain Burrell made a reasonable determination from the circumstances at the time. Having done this he decided, for the safety of the other inmates and the plaintiff, to place McCray in M.O. without clothes or a mattress. He testified that whenever he had reason to believe that an inmate might try to injure himself he removed from the cell any items that could be used for this purpose.

The plaintiff was allowed to remain in the M.O. area for approximately forty-eight hours, from January 1–3, 1972. It does not appear that he was visited by a medical doctor, nurse, or a psychologist during this interval. It is important to note that shortly after the plaintiff was treated in the dispensary, Nurse Weber contacted Dr. Holljes and advised him that the patient had been placed in M.O. She also attempted to contact a Dr. Stewart but was unable to reach him. The records introduced indicated that the plaintiff was next seen by a physician, a Dr. Wood, on January 4, 1972.

On January 13th the plaintiff was examined by Dr. Gould, who testified that at this time he noticed several crusted sores on McCray's cheeks, ears, a small amount on his back (which the plaintiff did not remember until questioned on cross-examination), and some sores on his knuckles. Dr. Gould further testified that the application of cold compresses and an antibiotic ointment, similar to the type applied to the plaintiff by Officer Martin, was the appropriate treatment to be employed. While he stated that this treatment should have been continued for a period of time, he could not say that it was inadequate.

Although no testimony was given to explain why a psychologist did not examine the plaintiff during his confinement in the M.O. area, it is evident to this Court that the New Year's holiday weekend was a contributing factor. Captain Burrell mentioned during his testimony that the Penitentiary was short-handed at this time, a factor he considered when he decided to place the plaintiff in the M.O. area.

The plaintiff contends that the procedures employed by both defendants were disciplinary in nature, and that they violated his right to due process of the law. He asserts that the requirements of due process were not satisfied when the defendants failed: (1) to give him adequate notice of the charges; (2) a hearing before a relatively objective tribunal; and (3) an opportunity to respond to or explain the alleged offenses.

It is true, as the plaintiff points out, that when a prisoner is subjected to substantial deprivations, they should be premised on a rational determination of facts. See Sostre v. McGinnis, 442 F.2d 178, 198 (2d Cir. 1971), cert. den. 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972). However, this Court disagrees with the allegations that the defendants transferred the plaintiff to an isolated area for disciplinary reasons. Rather, the testimony was quite clear in both cases that McCray had caused substantial disturbances, and he had been removed to avoid the possibility of continued disruptions that might involve substantial portions of the South Wing. It is important to bear in mind that the Maryland Correctional System, like many others, has been plagued by con-

siderable prisoner unrest. While this Court is not absolving the prisons of all responsibility for this problem, it is clear that a prison correctional officer must be concerned with avoiding situations which could ignite a riot. This was the principal factor considered by the defendants in placing the plaintiff in an isolated cell.

In both cases, once the decision to isolate the plaintiff was made, the defendants were faced with a dilemma. Sgt. Smith had to determine if the plaintiff's outburst was merely a way of venting his frustrations, or whether he was in such a frame of mind that he would actually attempt to harm himself. Captain Burrell's task was certainly no easier. Once he concluded that McCray may have set his cell on fire intentionally, a conclusion undoubtedly buttressed by the guards' reports and the fact that the plaintiff did not ordinarily smoke, the defendant Burrell had to determine if the plaintiff would continue to act in a dangerous and disruptive manner. Since the deliberate setting of a fire was not only dangerous to the other prisoners, but to the plaintiff as well, he had to be sure that McCray could not attempt to injure himself in some other way.

To require a prison official to refrain from isolating an inmate until a due process hearing can be held to determine if the prisoner might attempt to harm himself, and still subject the official to liability for not controlling the actions of that particular inmate, is totally unreasonable. Such a standard of conduct would lead to the resignation of many competent guards, and would deter others from pursuing this occupation as a career. The net result would be an everincreasing manpower shortage in our correctional systems, a problem that is already a major problem.

Captain Burrell and Sgt. Smith both stated that it was standard operating procedure, when confronted with an inmate exhibiting an irrational state of mind, to strip him of his clothes and remove the mattresses. While this procedure obviously caused the plaintiff considerable discomfort, it was certainly reasonable for the defendants to opt for this alternative rather than to risk the chance that the plaintiff might use these items to harm himself. Neither Sgt. Smith nor Captain Burrell had any other choice but to place McCray in an isolated cell for the security of the Penitentiary, and it was necessary to remove all of his clothes and the mattresses from the cell for his own safety.

While, ideally, it may be preferable to remove a prisoner placed in isolation for nondisciplinary reasons after a few hours, in these two cases such a course of action did not appear to be feasible at the times involved. When Sgt. Smith ordered the plaintiff removed from his cell on the South Wing, McCray reacted violently. After a night in the isolated confinement area, Sgt. Smith discovered that he had defecated and smeared his waste about the cell. Under an Administrative directive issued on August 10, 1970 by the Deputy Commissioner of the Department of Correctional Services, James Jordan, in the absence of a psychologist/psychiatrist, an inmate may be placed in an isolation cell for his own safety, or that of the inmate population, when he displays mentally disturbed behavior. Such behavior was clearly present in the instant case. The directive further provides that a psychologist/psychiatrist be immediately notified after the confinement, and the inmate should be evaluated within a twenty-four hour period. While Sgt. Smith may not have followed this directive to the letter, he did notify the psychologist the following morning, Sunday, November 21, 1971, when he discovered that the plaintiff had smeared defecation about his cell. He then ordered the cell cleaned and scrubbed, and after another day of observation he had McCray returned to the third tier of the South Wing.

In the case involving Captain Burrell, the plaintiff was confined in isolation in the Mental Observation area for forty-

eight hours. This incident not only occurred during the New Year's Day holiday period, a time when a substantial portion of the prison staff was on leave, but had endangered the lives of every inmate confined on the South Wing. Thus, the most pressing matter facing the defendant was the protection of the other inmates. Confronted with a skeleton crew of guards, his only alternative was to separate the plaintiff from the rest of the inmates until his staff returned to its normal strength on Monday, January 3rd. It also appears that the decision to deprive the plaintiff of his clothes and a mattress during the entire forty-eight hour period may have stemmed from the unavailability of a psychologist who could examine and evaluate McCray's condition.

None of these events constituted an arbitrary and capricious punishment of the plaintiff. In neither case was he removed from the South Wing as a disciplinary measure, but rather as a security precaution. The plaintiff's clothing and mattress were removed in both cases when he was placed in an isolation cell, in a reasonable attempt to prevent him from injuring himself. The length of time that he remained in isolated confinement was not unreasonable under the circumstances in either case. The fact that the plaintiff was not examined by a psychologist on either occasion was not a result of neglect by the defendants, but appears to have been caused by the unavailability of such personnel during the weekends in question. The Court thus concludes that Sgt. Smith and Captain Burrell did not arbitrarily impose a punishment upon the plaintiff in violation of his right to due process, but rather they were attempting to take reasonable precautionary measures to insure the safety of the plaintiff and the other inmates of the Penitentiary.

The plaintiff further contends that the condition of the cells and the lengths of time that he was confined constituted cruel and unusual punishment in violation of the eighth amendment. While the conditions of the cells were by no means luxurious, and his confinement undoubtedly unpleasant, this Court does not find that it constituted cruel and unusual punishment. When testifying on his own behalf against Sgt. Smith, the plaintiff admitted that when he discovered the condition of the first cell in which he was placed on the South Wing he "really started to perform." He also testified that he had, in fact, "hollered" long and loud when he did not immediately receive his legal materials. Once Sgt. Smith ordered the plaintiff removed from his cell and placed in the I. C. area, it appears that the plaintiff indicated he intended to do bodily harm to himself. Since Sgt. Smith had met McCray for the first time that same day, it was reasonable under the circumstances that he remove all items from the cell that could be used by plaintiff to carry out his stated intention.

Captain Burrell ordered the plaintiff confined in the Mental Observation area without clothing and without a mattress for similar reasons. The defendant testified that the intentional setting of a fire in one's cell was clearly an irrational act, and it is standard operating procedure at the Penitentiary to place an inmate in an isolated cell without clothes or a mattress when he exhibits an unstable state of mind.

The confinement of the plaintiff in both cases for forty-eight hours was not an unreasonable period when one considers the surrounding circumstances in each case. Sgt. Smith returned the next morning to find that the plaintiff had smeared defecation in his cell. This demonstrated a somewhat less than stable condition, and an additional twenty-four hours in isolation without clothes appears to have been warranted. Captain Burrell was faced with an inmate who had attempted to burn his cell, and possibly the entire South Wing. The Penitentiary was operating at this time with a skeleton crew, and did not return to its normal strength until January 3, 1972, the day the plaintiff was released from the M.O. area.

The physical aspects of the cells in the isolated cell area and the mental observation area (which are substantially the same) are primitive at best. However, it is significant that the plaintiff candidly admitted on several occasions he had requested to be placed in the I.C. area because it was more conducive to preparation of legal papers. While it is true that he was fully clothed on these latter visits to I.C.; it does indicate that the conditions of the cells were not intolerable.

The Court concludes that the defendants' actions were not excessive exercises of authority beyond the limits of civilized standards of decency. *See* Trop v. Dulles, 356 U.S. 86, 100–101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). Nor were they intended as punishment for the plaintiff's conduct, but, as has been repeatedly stated, they were employed as precautionary measures. The removals of the plaintiff from his cell on the South Wing to isolated cells were not pointless impositions of suffering, nor was there a less severe alternative that would have achieved the purposes for which the confinement was imposed. Furman v. Georgia, 408 U.S. 238, 92 S. Ct. 2726, 2747, 33 L.Ed.2d 346 (1972).

■ While the plaintiff asserts correctly that punishments which are not *per se* cruel and unusual may become so if they are disproportionate to the offense committed, such is not the case here. He cites LaReau v. MacDougall, 473 F.2d 974, 978 (2d Cir. 1972) for the proposition that confinement in a strip cell, even for short durations of time, falls "below the irreducible minimum of decency required by the Eighth Amendment." However, that case is distinguishable from the ones before this Court. In *LaReau* the prisoner was found in possession of contraband materials. Pursuant to prison regulations he was punished by the imposition of an indeterminate sentence, and he served five days in isolation. The finding there of cruel and unusual punishment by the Second Circuit appears to have been premised upon the fact that the punishment was disproportionate to the offense committed, and that a less severe punishment would have adequately achieved the purposes for which the punishment was imposed. Such is not the case here. The plaintiff was not confined as a punishment. He was isolated for his own protection and that of the other inmates. He was not confined any longer than was necessary to insure this protection. The placement of the plaintiff was not unreasonable in light of his conduct, nor was there a less severe alternative available to the defendants.

■ The allegation made in Civil Action No. 72–68–N, that Captain Burrell caused the plaintiff to be denied adequate medical care, is totally without merit. He was taken directly to the dispensary for treatment after the fire was placed under control. The treatment received by the plaintiff was shown to be the appropriate care for the type of injuries that he had allegedly received. Any failure of the medical staff to diagnose the extent of the injuries was directly attributable to the plaintiff's conduct. When he first arrived at the dispensary he was arrogant and refused any treatment. It was due only to the perseverance of Nurse Weber and Officer Martin, and their willingness to spend four times the normal length of time treating the prisoner, that he received any medication at all. Once he was placed in the mental observation area, Nurse Weber contacted Dr. Holljes and informed him of the incident, plaintiff's complaints, the extent of his injuries as she perceived them, and the treatment administered to him. Dr. Holljes instructed her to contact Dr. Stewart, which she unsuccessfully attempted to do. She testified that she did not continue in her efforts to reach Dr. Stewart because at 2 p. m. that same day there were no complaints from the plaintiff. In addition to this treatment, Mr. Musk, a psychologist for the Penitentiary, testified that he saw the plaintiff the week of January 4th concerning the incident.

Even if the plaintiff had not received this care, the Court does not see how Captain Burrell could possibly be held liable. His unrefuted testimony was that he was responsible for the control and security of the hospital, but not for its operations. Clearly, if the plaintiff was not treated properly by the medical staff, which the Court emphasizes was not the case, this could not be attributed to the defendant.

■ The defendants in these cases also have available to them the defense of reasonable good faith that their actions were constitutionally permissible. Landman v. Royster, 354 F.Supp. 1302, 1317 (E.D.Va.1973). The applicability of this defense to damage actions brought by a prisoner under § 1983 was recently recognized by the United States Court of Appeals for the Fourth Circuit in Skinner v. Spellman, 480 F.2d 539 (4th Cir., 1973). In that case the Court held that if the defendant could show he was acting in reasonable good faith reliance on standard operating procedure, he would not have to respond in damages.

In Civil Action No. 72–234–N, the testimony established that the plaintiff was causing a disturbance on the South Wing, and that the other inmates requested he be removed. It was also brought out on the cross-examination of Sgt. Smith that he had the authority to place an inmate in the I.C. area, and that after such action he was to immediately notify his immediate superior. There was no evidence introduced which would lead this Court to believe that Sgt. Smith had not notified his superior. The defendant Smith also stated there was a verbal understanding on the South Wing that an inmate was not to be kept in isolation for more than three days. This procedure was followed in this case.

In Civil Action No. 72–68–N, Captain Burrell followed an Administrative directive when he confined the plaintiff in the Mental Observation area after the latter apparently started a fire in his cell. Defendant stated that it was a normal operating procedure to remove the clothes of a prisoner who had exhibited an unstable mental and emotional state.

Therefore, since the defendants, as shown from all the facts, acted in good faith in exercising their discretion, Bennett v. Gravelle, 323 F.Supp. 203, 214 (D.Md.1971), they are immune from suit under 42 U.S.C. § 1983.

For the reasons stated herein, it is this 16th day of October, 1973, ordered:

1. That the defendants' Motions to Dismiss in Civil Actions Nos. 72–68–N and 72–234–N be, and the same hereby are, granted;

2. That plaintiff's claim for relief in Civil Action No. 72–68–N be, and the same is, denied; and

3. That the plaintiff's claim for relief in Civil Action No. 72–234–N be, and the same hereby is, denied.

## APPENDIX A

Habeas Corpus and 42 U.S.C. § 1983 Civil Rights Suits Filed by Milton McCray in the United States District Court for the District of Maryland

1. Milton McCray v. State of Maryland (H/C)—15745/62

*Suits filed in 1970* (9)

2. Milton McCray v. Forrest Calhoun, Jr. (C.R.)—70–164–W

3. Milton McCray v. Director Patuxent Institution, et al. (C.R.)—70–634–N

4. Milton McCray v. State of Maryland (C.R.)—70–1047–N

5. Milton McCray v. Eva Sacks (C.R.)—70–1064–N

6. Milton McCray v. State of Maryland (H/C)—70–1407–N

7. Milton McCray v. John O. Rutherford, Clerk of the Baltimore City Court (C.R.)—70–1409–N

8. Milton McCray v. Mr. Calhoun, et al. (C.R.)—70–1410–N

9. Milton McCray v. Mr. Boslow, etc. (C.R.)—70–1411–N

10. Milton McCray v. Mr. James A. Hall (C.R.)—70–1412–N

*Suits filed in 1971* (9)*

11. Milton McCray v. Patuxent Institution (C.R.)—71–184–N

12. Milton McCray v. Mr. Calhoun (C.R.)—71–237–N

13. Milton McCray v. Dr. Boslow and Staff (C.R.)—71–238–N

14. Milton McCray v. Dr. Boslow, et al. (C.R.)—71–239–N

15. Milton McCray v. Judge Sklar, et al. (C.R.)—71–240–N

16. Milton McCray v. Hon. Judge A. Sklar (C.R.)—71–552–N

17. Milton McCray v. Director Patuxent Institution (H/C)—71–991–N

18. Milton McCray v. Honorable Judge Sklar, etc. (C.R.)—71–1200–N

19. Milton McCray v. Warden Maryland Penitentiary (C.R.)—71–1395–N

*Suits filed in 1972* (14)

20. Milton McCray v. Warden of Maryland Penitentiary (C.R.)—72–68–N

21. Milton McCray v. Warden of Maryland Penitentiary (C.R.)—72–69–N

22. Milton McCray v. Sergeant V. D. Smith (Badge No. 153), Maryland Penitentiary—(C.R.)—72–234–N

23. Milton McCray v. L. R. Mooney, et al. (C.R.)—72–463–N

24. Milton McCray v. Warden Maryland Penitentiary (C.R.)—72–483–N

25. Milton McCray v. Mr. M. Hawkins, Warden Maryland Penitentiary (C.R.)—72–484–N

26. Milton McCray v. Paul R. Schlitz (C.R.)—72–485–N

27. Milton McCray v. Mr. Horowitz, States Attorney (C.R.)—72–521–N

28. Milton McCray v. Patuxent Institution (C.R.)—72–661–N

29. Milton McCray v. Francis B. Burch, Attorney General of Maryland, et al. (C.R.)—72–783–N

30. Milton McCray v. Director of Patuxent Institution (C.R.)—72–918–N

31. Milton McCray v. Off. Butterworth, et al. (C.R.)—72–919–N

32. Milton McCray v. Warden Maryland Penitentiary, et al. (C.R.)—72–1119–N

33. Milton McCray v. Warden Maryland Penitentiary, et al. (C.R.)—72–1139–N

34. Milton McCray v. Mr. Gerald McClellan, Warden, et al. (C.R.)—72–1172–N

*Suits filed in 1973* (3 as of 4/5/73)

35. Milton McCray v. State of Maryland Officials (C.R.)—73–55–N

36. Milton McCray v. Mr. Richard Kinlein (C.R.)—73–89–N

37. Milton McCray v. Mrs. Tucker Maryland Penitentiary, et al. (C.R.)—73–269–N

## APPENDIX B

| Milton McCray 110563 v. Warden, Md. Pen. | In The United States District Court for Maryland Civil 72–69–N |
|---|---|

### SUIT

To the Honorable Judge of said Court.

Petitioner, Milton McCray, and Officer Furrell of Md. Penitentiary had a pornography business going in the institution which profited them an average of seventy dollars a week. Because Officer Furrel did not know how much money petitioner was *making* he received between $15 to $20 a week or approximately $80 to 90 dollars a month.

### HOW THE MONEY WAS MADE

Pornography and sex books are prohibited in this institution therefore are in great demand by the inmate. Because of petitioner connection and reliable source Officer Furrel he had, at the time Mr. Furrel set him up to be caught, over fifty very good sex book.

Petitioner *Rent* said book for 2, 3 or 5 packs a night averaging 7 to 8 cartons a

night which are sold to the inmates a 4 packs for a dollar bring $15 or more in cash per night.

When petitioner was set up, Mr. Furrel and officers unknown went into petition's cell while he was working on Dec. 16, 1971 broke into petitioners locker, which was unnecessary since all they had to do was call petitioner and request the key, took (23) twentythree sex book and ($275) two hondred and seventyfive dollars and (95) ninetyfive packs of cigarettes.

When petitioner returned to his cell the door was open and all his valuable were gone either the officers had taken them or the inmate as a result of the officers, Mr. Furrell deliberately and spitefully leaving petitioners cell door open had taken them.

Petitioner immediately reported what had happened to his cell to the officer in charge who sent him to the major office.

Petitioner explained what had happened to the major who refused to investigate the matter properly. Petitioner requested that something be done about his property. Major Mills ordered petitioner locked in the hole. Four officer grab petitioner and when petitioner resisted the unexpected and brutal treatment he was beat cruelly with fist and magazines and thrown in the hole nude.

Petitioner was charged and tried but because petitioner had taped two of the business conversation the charges were dismissed.

### PETITIONER CONTEND

(1) That Mr. Furrell and officers had no right in petitioners cell without petitioner being present and a supervisor.

(2) That Mr. Furrell and officers had no right barglarizing petitioner locker (breaking lock) when all they had to do was request key from petitioner.

(3) That the following personal property was stolen or confiscated.

1) One set of law books        $50.00
2) one box of daily record
   papers        $200.00

3) one lock (cost 15 packs)        $5.00
4) 15 cassettes a $9 each        $135.00
5) 95 packs of cigarettes        $35.00
6) $275 in cash        $275.00
7) 2 mens watch        $185.00
8) 11 pair of silk under
   wear        $77.00
9) one cassette taperecorder        $50.00
10) one suit        $85.00
11) one shoes        $35.00
12) 6 shirts        $75.00
13) 1 leather jacket        $85.00
14) one AC triple jack adapter        $9.00
15) one microphone        $15.00
16) 7 pair of socks        $18.00
17) 3 pair of pants        $60.00
18) 23 sex books        $70.00

(4) That the institution admit to the lost of

1) 1 pair of pants        $20.00
2) 1 lether jacket        $85.00
   see no 13 above
3) 1 shirt        $16.00
4) 2 cassettes tape $1000.00 because they contained the taped conversation between petitioner and officer Furrell.

Wherefore petitioner pray that this Honorable Court will grant him $500.000 in damages etc. for Mr. Furrells and officers deliberate and spiteful negligence in leaving his cell open and for the confiscation of petitioners personal property.

s/ Milton McCray
Petitioner

I, Milton McCray, hereby certify that due to my poverty I am unable to pay the cost of this proceeding or give security therefor.

s/ Milton McCray

### APPENDIX C

Milton McCary
110563
v.
Warden Md. Penitentiary

In The Court
for Maryland
United States District
Civil 72–67–N
Jan. 13, 1972

## SUIT

To the Honorable Judge of Court.

On January 1, 1972 petitioner, Milton McCray's cell caught on fire, resulting from a lit cigarette falling from his hand into some paper while he was asleep. When he woke up his cell was blazing.

A officer ran up to the door with a fire extinguisher but nothing would come out.

## PETITIONER CONTEND

1. That the officer deliberately bought the empty fire extinguisher to his door knowing that it was empty. He could not help but know it was when he picked it up.

2. That said officer after finding out that said extinguisher was empty ran away and stayed for an eternity. The fire extinguisher being empty almost cost petitioner his life.

3. That the officers deliberately took their time putting the fire out, causing him to suffer first degree burns on the face, ears, hand, and arms. He is also having lung trouble.

4. That he has been denied medical treatment for two weeks.

5. That he has been laying on the floor suffering for over two week because no doctor would treat him.

6. That each doctor that saw him referred him to another doctor therefore no treatment was received, administered.

7. That because of the doctors deliberate spiteful and unprofessional negligence petitioner has suffered much pain.

8. That because of the deliberate negligence of the persons responsible the empty fire extinguisher has caused petitioner to suffer unnecessarily.

Wherefore petitioner pray that this Honorable Court will award him his immediate release and $500,000 in damages.

s/ Milton McCray

I, hereby, certify due to his poverty, he is unable to pay the cost of this proceeding or give security therefor.

s/ Milton McCray

## APPENDIX D

| | |
|---|---|
| Milton McCray | In the |
| vs. | Superior Court |
| Warden of Maryland | of |
| Penitentiary | Baltimore City |
| | June 25, 1973 |

## DECLARATION

## TO THE HONORABLE JUDGE OF SAID COURT:

On January 1, 1972, petitioner, Milton McCray's cell caught on fire resulting from a lit cigarette falling from his hands into some paper while he was asleep. When he awakened his cell was blazing. A officer run to McCray's cell door with a fire extinguisher but nothing came out. The officer ran away. He refused to open the cell door to let petitioner out of the burning cell.

## PETITIONER CONTEND

(1) That the defendant's, Warden and staff, lack of proper care and attention to the rules and laws governing fire extinguishers and fire control has caused him injury, pain and suffering.

(2) That the defendant's failure to properly inspect and immediately refull the institutions fire extinguishers pursuant to rules and laws governing fire extinguishers and fire control has caused him to suffer first degree burns of the face, ears, hands and back.

(3) That the defendant's carelessness and indifference to their duties and responsibilities concerning fires in inmates cells and fire control within the institution has caused him great injury, pain, suffering and mental anguish.

Wherefore petitioner claims $50,000 compensative damages and 75,000 punitive damages.

Petitioner respectfully request a Jury Trial.

s/ Milton McCray
954 Forrest Street
Baltimore Maryland