John WASHINGTON

v.

Dr. Harold M. BOSLOW, Director
Patuxent Institution,

and

Dr. Domingo C. Sorongon, M.D.,
Patuxent Institution.

Civ. No. 73–1025–N.

United States District Court,
D. Maryland.

May 17, 1974.

As Amended May 22, 1974.

tive remedies in § 1983 suits. Even if there is such a requirement, the plaintiff argues that he need not resort to the Inmate Grievance Commission because this remedy is inadequate since, among other relief, he seeks a monetary award, because he will be deprived of his jury trial right, and because the Commission does not accord him a full and fair hearing.

Charles F. Morgan, Baltimore, Md., for plaintiff.

Francis B. Burch, Atty. Gen. of Maryland, John P. Stafford, Jr., and Donald R. Stutman, Asst. Attys. Gen., for defendants.

NORTHROP, Chief Judge.

John Washington, an inmate at the Patuxent Institution for defective delinquents, brings this action pursuant to 42 U.S.C. § 1983 (1970) against Harold M. Boslow, Director of Patuxent Institution, and Dr. Domingo C. Sorongon, staff physician at Patuxent Institution, alleging that the defendants failed to provide the plaintiff with proper medical care in violation of the eighth and fourteenth amendments to the U.S. Constitution. For relief, the plaintiff requests that this Court (1) enter a judgment declaring that the defendants' acts, policies, and practices contravene the plaintiff's constitutional rights and (2) enter a judgment awarding compensatory and punitive damages. The defendants have moved to dismiss the instant suit on the sole ground that under this Court's opinion in McCray v. Burrell, 367 F.Supp. 1191 (D.Md.1973) (hereinafter referred to as McCray), a prisoner must exhaust the state administrative remedies provided by the Maryland Inmate Grievance Commission Act, Md.Ann.Code art. 41, § 204F (Supp. 1973), before he can maintain an action under § 1983, and the plaintiff has not complied with this requirement. In response, the plaintiff contends that under existing case law there is no requirement of exhaustion of state administra-

I.

In McCray, this Court made a thorough analysis of the case law under section 1983 and found that this judicial precedent did not preclude requiring exhaustion of state administrative remedies where the administrative proceedings provide a fair and adequate remedy. McCray, 367 F.Supp. at 1196–1201, 1209–1210. This Court adheres to the principle of McCray and finds no reason to alter its opinion in that case. The recent Supreme Court case of Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), cited by the plaintiff, is inapposite. While the Court in Steffel did state at one point that "[w]hen federal claims are premised on 42 U.S.C § 1983 . . . we have not required exhaustion of state judicial or administrative remedies . . . " (94 S.Ct. at 1222), the factual and legal setting for this statement differs markedly from the instant case. The only question addressed by the Supreme Court was whether under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), "declaratory relief is precluded when a state prosecution has been threatened, but is not pending, and a showing of bad faith enforcement or other special circumstances has not been made." 94 S.Ct. at 1213. Since exhaustion will be required by this Court, the only remaining issue is whether the Inmate Grievance Commission Act in the instant case accords the plaintiff a fair and adequate remedy.

The plaintiff finds inadequacy in several areas of the Inmate Grievance

proceedings. The plaintiff first asserts that the inability of the Commission to award damages is a fatal flaw to its effectiveness. A short answer to this contention would be that the plaintiff seeks both equitable and legal relief in this suit and, as stated in *McCray*, 367 F. Supp. at 1208–1210, the Inmate Grievance Commission has been invested with powers comparable to the equity power of a federal court, and the prisoner will not be prejudiced by delaying an award of damages until the Inmate Grievance procedures have been exhausted. This Court, however, has gone one step further. If the only relief requested is an award of damages, the Inmate Grievance Commission Act still provides an adequate remedy to the prisoner. "The claim for monetary damages is inextricably tied to prison regulations and disciplinary procedures." *McCray*, 367 F. Supp. at 1210. Even though the prisoner may not assert it, there is an ever-present possibility that the conditions giving rise to the prisoner's claim for damages may still exist and go uncorrected if the prison authorities are not fully apprised of them. Dene L. Lusby, Executive Director of the Inmate Grievance Commission, stated in his deposition of February 28, 1974 in this case, that when a grievance requesting only damages is filed, a hearing is held for the purpose of, *inter alia*, determining the validity of the claim. If the grievance is meritorious in whole or in part, the Commission would then recommend procedures designed to prevent a recurrence of the situation.

If the specific condition producing the harm will not happen again, the Inmate Grievance procedures still perform a vital function in the overall process of securing a damage award. "The Maryland Inmate Grievance Commission provides a forum with built-in judicial review which can more expertly sort out the meritorious from the frivolous . . . [and] having taken this route the complaining prisoner can come to this Court with the issue of liability clearly defined on the record." *McCray*,

367 F.Supp. at 1210. While a determination of the Grievance Commission or the state courts on the merits of a prisoner's claim is not binding on this Court, a preliminary indication of validity serves as a valuable aid to a federal court. With 103 prisoner civil rights cases presently pending in the District of Maryland, a meritorious claim, of which there are few, in all likelihood cannot possibly be processed as rapidly as the State grievance procedure. Initial action by the Inmate Grievance Commission serves to alert this Court to a case in which constitutional deprivations are likely to have occurred, and this Court can move the case into its regular trial calendar.

A reasonably expeditious resolution of a prisoner's grievance can then be obtained since this Court will have before it a complete record of the controversy. Each hearing before the Commission is recorded on a Voicewriter and transcribed when an inmate seeks judicial review in the state courts. The transcript, coupled with the findings of the Commission and state courts, can be employed by this Court to arrive at the central issues for trial, thereby significantly reducing the trial time involved.

Thus the relief available from the Inmate Grievance Commission, although not exactly comparable to an award of damages, is critical to the welfare of the inmate, to the proper administration of the correctional institution, and to the expeditious resolution of the inmate's grievance.

The plaintiff next argues that requiring exhaustion of state administrative remedies will deprive plaintiff of his right to a jury trial. At the threshold, this contention assumes that there is a right to a jury trial in a § 1983 suit. Only a few courts have directly addressed this issue, and their conclusions are in conflict. *Compare* Lawton v. Nightingale, 345 F.Supp. 683 (N.D.Ohio 1972) *with* Cook v. Cox, 357 F.Supp. 120 (E.D.Va.1973). If there is a right to a jury trial, this Court fails to see how resorting first to the Inmate Grievance

Commission will prejudice a prisoner's jury trial right. These administrative proceedings will not estop the plaintiff from having those issues appropriate for jury resolution fully tried before a jury.

The plaintiff last asserts that the Inmate Grievance Commission Act does not accord the plaintiff a full and fair hearing within the meaning of the due process clause. In *McCray*, this Court discussed extensively the Inmate Grievance procedures and found that these procedures satisfied the requisites of due process. The plaintiff argues here, however, that at a hearing before the Commission he is unreasonably restricted in his ability to call and cross-examine witnesses and subpoena documents, and that he is unable to engage in pre-trial discovery. An inmate has the right to call a reasonable number of witnesses, subject only to the discretion of the Commission as to the relevancy or cumulative nature of the testimony, and this discretion cannot be unreasonably exercised by the Commission. Md.Ann. Code art. 41 § 204F(h) (Supp.1973). Any unreasonable refusal to allow an inmate to call a witness is reviewable in state court. Again, the inmate has a right to subpoena documents, and this right is subject only to the Commission's determination of the usefulness of the documents in deciding the merits of the claim. Public Safety and Correctional Services R. 12.07.00.04(2) (Inmate Grievances). This right may not be unreasonably restricted by the Commission, and any such action is reviewable in state court. While the plaintiff does not have the right to full pre-trial discovery, he has not cited to any case that holds discovery to be an essential element of due process. This Court finds that the lack of full discovery does not render the hearing "unfair." *Cf.* Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

The broad authority of the Secretary of the Maryland Department of Public Safety and Correctional Services to review the orders of the Inmate Grievance Commission is also attacked as violative of the plaintiff's due process rights. Specifically, the plaintiff states that the Secretary, in deciding whether to affirm, modify, or reverse the Commission's order, is able to go outside the record and consider additional evidence. The plaintiff, however, has cited to only one case in which the Secretary actually employed new evidence in his decision. That case, In re Midgett, Minnick & Minnick, I.G.C. #1295, #1282 (consolidated), involved a riot at the Maryland Penitentiary that occurred after the decision of the Grievance Commission and rendered compliance with the Commission's order impossible. In his deposition, Secretary Robert J. Lally, clearly indicated that only in those circumstances where it is impossible to carry out the Commission's recommendations is the order modified or reversed based on information outside of the record. In all other cases the Secretary will remand for the taking of further evidence.

If the Secretary could exercise his authority in any other manner prejudicial to a full and fair hearing, a representative sampling of his actions in reviewing the Commission's orders indicates that he has not done so in practice. From November 19, 1973 to February 20, 1974, 33 prisoner complaints were found meritorious in whole or in part by the Commission. Of that number 31 have been reviewed by the Secretary with the following results: 28, or over 90%, were affirmed without modification; 3, or less than 10%, were affirmed as modified; and *none* were reversed. Any future disposition of the Secretary to act in an arbitrary manner is inhibited by the review available in state court. Where in Toney v. Reagan, 467 F.2d 953 (9th Cir. 1972), a University President had the power to overrule the recommendation of a faculty committee on rehiring, the grievance procedure for teachers who were not rehired was not inadequate, because there was a carefully constructed appeal to the Chancellor's Review Committee, and this appeal was a

reasonable check against an arbitrary decision of the President.

In sum, this Court, after a second look, finds that the Inmate Grievance Commission Act provides a fair and adequate remedy to the plaintiff. The inability of the Commission to award damages is not fatal to the efficacy of its remedy. Indeed, the Act furthers the inmate's claim appreciably by alerting this Court to a meritorious grievance and by providing a record of the proceedings. At the hearing before the Commission the inmate is accorded all of the procedural rights mandated by the due process clause. The Secretary's review authority also does not contravene due process since in practice he has not exercised this authority in an arbitrary or prejudicial manner, and any inclination to do so is checked by the availability of state judicial review.

## II.

This case is a good example of the type of complaint which should be subject to the Inmate Grievance Commission screening so that it may be determined whether any acts, policies, or practices of prison personnel in any way violated this inmate's constitutional rights as articulated in 42 U.S.C. § 1983. If they were not, this suit, at best, is a straight tort action medical malpractice which belongs in a state court. It is difficult for this Court to believe that Section 1983 jurisdiction should be extended to such an action. It would, in effect, give an inmate a right to resort to the federal courts beyond that of an individual citizen of a state. If, on the other hand, the claim is a meritorious one under Section 1983, the state procedure would sharpen the issues and furnish a record which, if necessary, could be supplemented in this U.S. District Court on the damage claim.

Most importantly, the State would have had the first opportunity to put its prison in order.

The United States Supreme Court recognized this "paramount state interest" in Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 1837–1838, 36 L.Ed.2d 439 (1973).

It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons. The relationship of state prisoners and the state officers who supervise their confinement is far more intimate than that of a State and a private citizen. For state prisoners, eating, sleeping, dressing, washing, working, and playing are all done under the watchful eye of the State, and so the possibilities for litigation under the Fourteenth Amendment are boundless. What for a private citizen would be a dispute with his landlord, with his employer, with his tailor, with his neighbor, or with his banker becomes, for the prisoner, a dispute with the State. Since these internal problems of state prisons involve issues so peculiarly within state authority and expertise, the States have an important interest in not being bypassed in the correction of those problems. Moreover, because most potential litigation involving state prisoners arises on a day-to-day basis, it is most efficiently and properly handled by the state administrative bodies and state courts, which are, for the most part, familiar with the grievances of state prisoners and in a better physical and practical position to deal with those grievances. In New York, for example, state judges sit on a regular basis at all but one of the State's correctional facilities, and thus inmates may present their grievances to a court at the place of their confinement, where the relevant records are available and where potential witnesses are located. The strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors thus also require giving the States the first opportunity to correct the errors made in the internal administration of their prisons. [Footnote omitted].

The observations of Judge Ruggero J. Aldisert, United States Circuit Judge of the U.S. Court of Appeals for the Third

Circuit, as set out in *Judicial Expansion of Federal Jurisdiction: A Federal Judge's Thoughts on Section 1983, Comity and the Federal Caseload,* 1973 Law & Soc. Order 557, 566–67, (published by the Arizona State University Law Journal) is particularly appropriate in summing up the whole situation:

> There is also a point of view which first came to me over a cup of coffee from an experienced and sensitive federal trial judge, whose record proves he has been concerned with protecting the rights of the state prisoners. In discussing this subject, he admitted an abiding concern that, in his efforts to improve the lot of many prisoners, he was actually producing the opposite effect. The judge commented that he was afraid he had been playing warden, but was not sure that he had succeeded well. He remarked that while he thought he had given the prisoners their constitutional rights, he had also crippled prison discipline. The guards were now scared; what is more, they were demoralized. He observed that guards are now taunted, abused and spat upon, that competent personnel are leaving. As a consequence, many of the prisoners are at the complete mercy of other prisoners —toughs and bullies who are having a field day. In short, the judge was very much afraid that the federal judiciary had made a serious mistake. The courts had given birth to something and now could not put the baby back.

Meanwhile prisoners' petitions continue to inundate the federal courts, pathetic, handwritten grievances; some very real; some rather illusory; some with genuine constitutional issues; some merely stating disagreements with administrative decisions. This litigious flood consumes may judicial manhours and challenges the abilities of federal courts to cope with their own calendars. Mr. Justice Powell's recent statement concerning state habeas corpus in the federal system is equally applicable to prisoners' civil rights claims: "The current flood of petitions . . . already threatens—because of sheer volume— to submerge meritorious claims and even to produce a judicial insensitivity to . . . petitioners." [43]

43. Boyd v. Dutton, 405 U.S. 1, 8, 92 S. Ct. 759, 30 L.Ed.2d 755 (1972) (Powell, J., dissenting).

Statistics vividly illustrate Justice Powell's point. In 1966, there were 218 civil rights petitions filed by state prisoners in federal courts. Six years later, in fiscal 1972, there were 3,348 petitions filed. Last year, the percentage increase over the previous year was 19.4 percent. In that same year there were a total of 96,173 civil filings in the federal district courts; of these, 16,267 were prisoner petitions of all kinds. Thus, one out of every six civil cases which came before a district court judge last year was a prisoner petition. We are told that

> if prisoner petitions were dropped from federal court statistics the number of civil cases filed in the first six months of fiscal year 1973 would have been 39,533, only 1.1 per cent more than the comparable figure (excluding prisoner petitions) from the last year.[44]

44. 1973 SEMI–ANNUAL REPORT OF THE DIRECTOR OF THE ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS 20. The 1973 Semi-Annual Report discloses 8,072 prisoner petitions out of a total filings of 47,625 or 17.0 percent. *Id.* Figure 12. In the Fourth Circuit, 27.6 percent of all civil filings were prisoner petitions. Of 12,379 total appeals from district courts in fiscal 1972, there were 6,601 prisoner appeals (or direct criminal appeals on collateral review or civil rights actions), 53.3 percent of the entire appellate docket from district courts. *Id.* Figure 5.

The Freund Committee [45] met this

45. ADMINISTRATIVE OFFICE OF U. S. COURTS, FEDERAL JUDICIAL CENTER REPORT OF THE STUDY GROUP ON THE CASELOAD OF THE SUPREME COURT (1972) [hereinafter cited as FREUND COMMITTEE].

phenomenon with refreshing candor:

The number of these petitions found to have merit is very small, both proportionately and absolutely. But it is of the greatest importance to society as well as to the individual that each meritorious petition be identified and dealt with. And yet it seems a misallocation of resources to impose the burden of sifting through the mass of these petitions on federal judges, let alone Supreme Court justices.[46]

46. *Id.* at 13.

While the deluge of prisoner petitions descends upon the federal courts, nothing is directed to the state courts, to the state judges who ordered incarceration in the first instance. And while state courts clearly have inherent power to require the establishment of administrative procedures to process prisoner complaints and to deal with legal problems generated by prison life, under recent case law it is the federal judge who must listen to state prisoner complaints. Even acknowledging the basic responsibilities of an Article III judge to be hospitable to constitutional claims, the federal judiciary's receptiveness to prisoners' civil rights claims no longer makes sense in view of the burgeoning federal case load.

Where a state has established a grievance procedure such as in Maryland, federal intrusion into the state penal system can only fire-up an already incendiary atmosphere.

For these reasons, it is this 17th day of May, 1974, Ordered:

1. That the defendants' Motion to Dismiss be, and the same hereby is, granted.

2. That the Clerk of Court is directed to mail copies of this Opinion to Charles F. Morgan, Esquire, attorney for plaintiff, and the Donald R. Stutman, Assistant Attorney General of Maryland.